IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br><br><br> vs. <br><br><br> IRVING FREIBERG and HARVEY L. CARMICHAEL a/k/a HARVEY L. CARNICLE, <br><br> Defendants. | FINDINGS OF FACT AND CONCLUSIONS OF LAW <br><br><br><br> Case No. 2:05-CV-00233PGC |

At issue in this civil securities action is the allegedly wrongful conduct of Harvey L.

Carmichael, a young man who became involved in the reverse merger of a small company,

Gateway International Holdings, Inc.  The Securities and Exchange Commission lodged a host of

allegations against Mr. Carmichael, claiming he violated reporting and registration provisions,

attempted to artificially inflate the market for the company's shares, and participated in a

fraudulent publicity campaign.  The SEC asks the court to enjoin Mr. Carmichael from certain

participation in the securities business and requests that the court order disgorgement of Mr.

Carmichael's profits and impose a civil penalty.

On April 2 and 3, 2007, this matter came before the court for a bench trial.  Mr.

Carmichael appeared, represented by his counsel, Paul Moxley and Catherine Brabson.  Julie

Lutz and Polly Atkinson represented the SEC.  In advance of the trial, the parties designated

various deposition testimony and submitted briefs.  After the trial, the parties submitted

additional briefs, as well as proposed findings of fact and conclusions of law.

Based upon the evidence, the court concludes Mr. Carmichael is liable for participating in

a fraudulent publicity campaign, but finds the SEC failed to present sufficient evidence to

support its other claims.  An injunction based on Mr. Carmichael's single securities violation is

unwarranted, but the court does find it appropriate to order disgorgement of Mr. Carmichael's

profits.  The court is also considering imposing a civil penalty on Mr. Carmichael.  The parties

are ordered to provide further briefing on both the appropriateness and the amount of any civil

penalty as well as the amount of disgorgement the court should order.

## FACTUAL BACKGROUND

Mr. Carmichael was 29 years old in 2001, the year in which the events at issue in this

case took place.[1]  He never completed high school and he had some difficulty reading.[2]  Mr.

Carmichael suffered from short-term and long-term memory impairment due to a motorcycle

accident that occurred in 2003 or 2004.[3]

Mr. Carmichael is currently the CEO of Beneficial Holdings, Inc., a publicly traded

company.  Beneficial stock is quoted in the NASD "pink sheets."[4]  Mr. Carmichael is the sole

officer, director, and employee of Beneficial, and he is the controlling shareholder.  He formed

---

[1] Trial Tr. at 25.

[2] *Id.* at 231; Carmichael Depo. at 80–81, 202.

[3] Trial Tr. at 25; Carmichael Depo. at 17–19.

[4] Trial Tr. at 28.

the company by merging a private company into a public shell.[5]  In 2003, Beneficial had contracts with major retailers — CVS, GNC, and Walgreens.  At one point, CVS failed to pay $1.7 million in receivables, leaving Beneficial with insufficient operating capital to continue.[6]  Beneficial essentially became a dormant company.  It has posted no revenue over the last year, and the company generates no financial statements.[7]  Mr. Carmichael cares for his two young children and his wife works as an attorney in Salt Lake City.[8]

For a time, Mr. Carmichael worked in his "family business" — a company that consulted on public companies, found public companies for transactions, and tried to raise money from investors.  Mr. Carmichael was president of the company, M&M Investments, for awhile and he held stock in his own name.[9]  In 1993, M&M went out of business when its founder, Mr. Carmichael's brother, went to prison.[10]

In 1997, Joe Thomas hired Mr. Carmichael to work as a loan officer at his business, Intermountain Mortgage Company, in Salt Lake City.[11]  At the time, Mr. Carmichael was 25 years old.  Mr. Thomas, on the other hand, was an educated accountant with experience working on public companies and reverse mergers.[12]  Mr. Thomas and Mr. Carmichael became friends.  In

---

[5] *Id.* at 25–30.

[6] *Id.*

[7] *Id.*

[8] Carmichael Depo. at 69.

[9] *Id.* at 83–91, 96–97; Trial Tr. at 30–31.

[10] Carmichael Depo. at 89–99.

[11] Trial Tr. at 196.

[12] *Id.* at 229–30, 242, 250.

late 2000 or early 2001, Mr. Carmichael left that position to become an investment banker.[13]

After this time, Mr. Carmichael's friend, Dante Panella, introduced Mr. Carmichael to Robert Thompson.[14]  Mr. Carmichael worked on a reverse merger involving Cal-Bay, a company of Mr. Thompson's, and he later served as a consultant to Mr. Thompson and Cal-Bay.  Mr. Carmichael's consulting contract with Cal-Bay is still in effect.[15]

*(A)      The Reverse Merger*

At one point, Mr. Thompson told Mr. Carmichael about E.M. Tool Company, Inc., a company that wished to go public.  "Going public" means that shares of stock are traded on a public exchange and can be bought by the general public.  Mr. Carmichael knew Joe Thomas had previously helped other companies go public, so he approached Mr. Thomas about the company.[16]  Mr. Thomas evaluated E.M. Tools, and traveled to California to meet with the principals in September 2001.[17]  The principals of E.M. Tool were Larry Consalvi, President, Joseph Gledhill, partner and financier; Brent Mouton, CFO; and Dante Panella, investor relations director and Mr. Gledhill's securities broker and financial adviser.[18]

Mr. Thomas also reviewed the financial data of E.M. Tool.  E.M. Tool wanted to become a publicly traded company so it could acquire other companies using publicly traded stock, raise

---

[13] *Id.* at 197.

[14] Carmichael Depo. at 196.

[15] *Id.* at 91–94, 106–110.

[16] Trial Tr. at 33, 203, 211, 232.

[17] *Id.* at 206.

[18] *Id.* at 37–38.

money for its capital needs, and achieve efficiencies through consolidation.[19]  Then, Mr. Thomas

found Gourmet Gifts, a shell (a public company with no operations), thinking it may be a

candidate for a reverse merger with E.M. Tool.[20]  E.M. Tool was not financially strong in

September 2001.[21]  E.M. Tool had no manufacturing operation or production line at the time of

the meetings with Mr. Carmichael and Mr. Thomas regarding the potential merger.[22]

In September 1997, Gourmet Gifts was incorporated in Nevada.[23]  In September 1998, the

company publicly offered its securities under Rule 504 of Regulation D of the Securities Act.

The company raised $32,300.[24]  Gourmet Gifts' business of selling speciality products and gift

baskets was unsuccessful.  From 1998 to 1999, the company was short on cash and maintained

its business through loans from Stanley Stilwell, a shareholder in the company and a consultant

to it.[25]  From August 1999 until the fiscal year ending September 30, 2001, the company was

dormant.  In September 2001, the company decided to find an acquisition candidate.[26]

In September 2001, Mr. Carmichael accompanied Mr. Thomas to Las Vegas to meet with

Mr. Stilwell about merger possibilities between E.M. Tool and Gourmet Gifts.[27]  Mr. Carmichael

did not remember having a significant role at the meeting, indicating he did not know if an

---

[19] *Id.* at 40, 42, 206–12.

[20] *Id.* at 202.

[21] *Id.* at 212, 250.

[22] Mouton Depo. at 33–36.

[23] Exh. 145 at 3; Exh. 35.

[24] Exh. 145.

[25] Stilwell Depo. at 6–8.

[26] Exh. 145 at 3.

[27] Trial Tr. at 45–46, 209–10; Stilwell Depo. at 38–41.

agreement was reached or what was discussed.[28]  After the meeting, Mr. Carmichael and Mr.

Thomas met with the principals of E.M. Tools again.[29]  From late 2001 to early 2002, Mr.

Carmichael attended between three and six meetings with Mr. Consalvi regarding the reverse

merger between E.M. Tool and Gourmet Gifts, and was often at the offices of E.M. Tool.[30]

Mr. Thomas indicated Mr. Carmichael was supposed to be involved in helping E.M. Tool

raise $2 million, after it went public.[31]  Mr. Thomas also understood Mr. Carmichael was to find

market makers for the public company resulting from E.M. Tool.[32]  Mr. Carmichael, however,

denied agreeing to do this.[33]  Mr. Carmichael never reviewed the financial statements of E.M.

Tool, nor did he take any steps to do so.[34]  According to Mr. Mouton, Mr. Carmichael also agreed

to introduce the company to people who may provide financing for it and he attended meetings

with prospective investors at Gateway.[35]

Mr. Thomas negotiated the terms of the reverse merger transaction.[36]  Mr. Carmichael

denied having an active role in creating the merger terms.[37]  As part of the merger process, Mr.

Thomas was named interim president of Gourmet Gifts.  He received 800,000 shares of stock for

---

[28] Trial Tr. 161, 164–68.

[29] *Id.* at 211; Carmichael Depo. at 132.

[30] Consalvi Depo. at 20–21, 25; Mouton Depo. at 38–39.

[31] Trial Tr. at 213–14.

[32] *Id.* at 215.

[33] Carmichael Depo. at 50.

[34] *Id.* at 138–42.

[35] Mouton Depo. at 50–53.

[36] Trial Tr. at 250–51.

[37] Carmichael Depo. at 172.

locating the public company.[38]  Gourmet Gifts reported a change in control of the company on October 24, 2001, after Mr. Thomas became president.[39]  On October 26, 2001, Mr. Thomas sent a letter to shareholders informing them he was Gourmet Gifts' new president and mentioning the negotiations for a possible merger.[40]

The letter of intent for the merger was signed on November 6, 2001.[41]  On November 9, 2001, E.M. Tools and Gourmet Gifts announced their intent to merge in a press release.[42]  Mr. Thomas discussed doing a forward split with Mr. Carmichael because Mr. Carmichael helped Mr. Thomas arrange the merger.[43]  Then, on November 21, 2001, a four-for-one forward split of Gourmet Gifts stock was announced, effective December 3, 2001.[44]  On December 11, 2001, the agreement to merge was executed.  The name of the resulting company was Gateway International Holdings, Inc.[45]  In a press release of December 12, 2001, the merger was officially announced.[46]

Under the terms of the merger, the principals of E.M. Tool received all of the shares of stock.  Mr. Consalvi received 175,300 shares.  Mr. Gledhill received 175,300 shares.  Mr.

---

[38] Trial Tr. at 235–38.

[39] Exhs. 175, 185.

[40] Exh. 304.

[41] Exh. 179.

[42] Exhs. 38, 304.

[43] Trial Tr. 219.

[44] Exhs. 175, 179, 181 at 7.

[45] Exhs. 4, 179; Trial Tr. at 46.

[46] Exh. 37.

Mouton received 381,977 shares.  Mr. Panella (the Pelican Trust) received 803,423 shares.[47]

After the closing of the merger transaction on January 23, 2002, Mr. Thomas resigned as the

president of Gateway.  Mr. Consalvi took the role of CEO and the E.M. Tool principals took

over.[48]  Mr. Thomas maintained some involvement with Gateway.  For instance, he helped

respond to NASD information requests in April 2002.[49]  Mr. Carmichael hoped to have a role in

the future operations of Gateway, but he received no shares and no compensation in connection

with the merger.[50]

   (B)    Exchange of Stock

   As of August 2001, Gourmet Gifts' stock had not been traded or quoted for a significant

time period, even though there was a symbol for it on the NASD bulletin board.[51]  A number of

original Regulation D purchasers complained to Mr. Stilwell about the lack of a trading market in

the stock.[52]  Before execution of the merger agreement, Mr. Stilwell told Mr. Carmichael he and

other shareholders wanted to sell their shares before the merger was completed.  He asked if Mr.

Carmichael knew of any potential purchasers.[53]  According to Mr. Stilwell, Mr. Carmichael

indicated he would purchase any available shares of Gourmet Gifts.[54]  Mr. Carmichael maintains

---

[47] Exh. 4 at 25; Trial Tr. at 234–35.

[48] Exh. 179; Trial Tr. at 252–54.

[49] Exh. 179; Trial Tr. at 252–54.

[50] Trial Tr. at 237, 250–51; Carmichael Depo. at 158.

[51] Stilwell Depo. at 41–43, 49.

[52] *Id.* at 43, 48–49.

[53] Trial Tr. at 48–50, Carmichael Depo. at 185, Stilwell Depo. at 52.

[54] Stilwell Depo. at 52–53.

that he approached his father and Mr. Consalvi about buying the shares.[55]  Mr. Carmichael's father and Mr. Consalvi gave Mr. Carmichael money with which to buy the shares.  Mr. Carmichael did not negotiate the purchase price.[56]

At Mr. Stilwell's direction, Kim Farran gathered endorsed stock certificates.[57]  Initially, Wayne Halliburton collected certificates from the original shareholders of Gourmet Gifts.[58]  Then, Mr. Farran collected the certificates (for 178,000 shares) of Gourmet Gifts from Mr. Halliburton and from some other original shareholders.[59]  Mr. Halliburton denied knowing what happened to the certificates after he gave them to Mr. Farran.[60]  Ultimately, Mr. Stilwell told Mr. Carmichael to deliver the money to Mr. Farran in exchange for the certificates.[61]  And either Mr. Stilwell or Mr. Thomas told Mr. Farran to meet Mr. Carmichael in Reno to exchange the certificates for cash.[62]  Mr. Farran had no substantive conversations with Mr. Carmichael before meeting with him at the airport.  Mr. Carmichael relied on Mr. Stilwell's advice regarding the transaction, and established the price, the offer, and details with either Mr. Stilwell or Mr. Thomas.[63]

---

[55] Trial Tr. at 48–50; Carmichael Depo. at 185.

[56] Trial Tr. at 48–50; Carmichael Depo. at 185.

[57] Trial Tr. at 48–53; 59–60; Farran Depo. at 6, 11–13, 18.

[58] Halliburton Depo. at 12–19; 30–34, 36, 38; Exhs. 26, 51.

[59] Farran Depo. at 8, 13–14, 18–19, Exh. 51.

[60] Halliburton Depo. at 16.

[61] Trial Tr. at 48–53; 59–60; Farran Depo. at 6, 11–13, 18.

[62] Farran Depo. at 8, 11–13, 18.

[63] *Id.*

The exchange occurred at the Reno airport in about October 2001.[64]  Mr. Farran gave at least 23 certificates representing at least 178,000 shares of Gourmet Gifts to Mr. Carmichael in exchange for around $13,0000 cash.[65]  Mr. Carmichael was unsure how many shares Mr. Farran gave him.[66]  Neither Mr. Consalvi nor Mr. Carmichael's father discussed the prices with him.[67]  The shares Mr. Carmichael picked up from Mr. Farran were medallion-guaranteed, so anyone could negotiate them.[68]

Originally, all of the Gourmet Gifts stock was issued to shareholders via certificates numbered 1001 through 1043.[69]  Mr. Farran identified the specific certificates he gave to Mr. Carmichael with check marks, from the list of 43 original stockholders.[70]  After the exchange, Mr. Consalvi instructed Mr. Carmichael to transfer stock to various individuals, providing him with a list of names and stock amounts.[71]  Mr. Carmichael surrendered some of the stock certificates for transfer, in accordance with Mr. Consalvi's directions.  Mr. Carmichael could not remember whether this occurred before or after he delivered the remainder of the certificates to Mr. Consalvi.[72]  But according to stock transfer records, 80,000 shares (5 certificates) from Mr. Farran were transferred to five different individuals — Rick Smith, Steve Clark, Dave Hanson,

---

[64] Trial Tr. at 53; Exh. 30

[65] Trial Tr. at 48–50; Carmichael Depo. at 185; Farran Depo. at 8, 13–14, 18–19; Exh. 51.

[66] Trial Tr. at 50, Carmichael Depo. at 185–87.

[67] Carmichael Depo. at 195–96.

[68] Trial Tr. at 49–50.

[69] Exh. 35 at 1.

[70] Farran Depo. at 18–19 ; Exh. 51.

[71] Trial Tr. at 53–55; Carmichael Depo. at 202–04; Exh. 7.

[72] Trial Tr. 49–50.

Jeff Christiansen, and Brad Wilkerson.[73]  These transfers were made consistent with the names, addresses, and share amounts Mr. Consalvi provided to Mr. Carmichael.[74]

Mr. Consalvi denied that he ever expressed interest in buying Gourmet Gift stocks from shareholders, or that he gave Mr. Carmichael any money to obtain Gourmet Gift stock.[75]  Further, he testified to being unaware that Mr. Carmichael had obtained any Gourmet Gift stock certificates.  He denied ever receiving or possessing any such certificates from Mr. Carmichael.[76]  Moreover, Mr. Consalvi denied knowing any of the parties to whom Mr. Carmichael transferred the certificates.[77]  None of the certificates Mr. Carmichael obtained from Mr. Farran was ever transferred into Mr. Consalvi's name.[78]  Mr. Carmichael explained that both he and Mr. Consalvi knew Mr. Consalvi could not hold the shares in his own name without restrictions.[79]

In a recent administrative case involving Mr. Consalvi, the SEC sought and obtained a disgorgement order and injunction against Gateway and Mr. Consalvi, based on extensive violations of reporting requirements.  The Commission found that Gateway's conduct was recurrent, egregious, and evidenced serious culpability.  Additionally, the Commission found that "Consalvi made a conscious decision to disregard the reporting obligations Gateway had assumed in registering its stock" and that his "past actions and his testimony and demeanor at the

---

[73] Exh. 7.

[74] Trial Tr. at 53–55; Carmichael Depo. at 202–04; Exh. 7.

[75] Consalvi Depo. at 33–34.

[76] *Id.* at 34.

[77] *Id.* at 96.

[78] Exh. 35

[79] Trial Tr. at 80; Consalvi Depo. at 102–04.

hearing raised significant concerns about the risk that he would commit future violations."[80]

       With respect to the remainder of the certificates, Mr. Carmichael gave five of the certificates he obtained from Mr. Farran to his father. He kept two of the certificates for himself, and gave the rest to Mr. Consalvi.[81] Just before Mr. Carmichael's father died from illness in 2003, he returned his certificates to Mr. Carmichael. The stocks had never officially been transferred into his father's name. Mr. Carmichael tried to transfer his father's shares into his own name in 2003, but Gateway and Mr. Consalvi stopped the transfer. Litigation is pending in federal court in Nevada over these shares.[82]

       At one point, Mr. Carmichael gave one of the certificates he obtained from Mr. Farran to Chuck McHenry to pay a cellular phone bill.[83] He used the other to repay a loan to Myrna Gillen.[84] In March 2002, another Gourmet Gift stock certificate from Mr. Farran (in Roy Halliburton's name) was transferred to Ms. Gillen — but there is no evidence as to who effected the transfer.[85] Then, in May 2002, Mr. Carmichael presented a certificate obtained from Mr. Farran for transfer into his name.[86] And in January and April 2002, Mr. Stilwell presented four of the stock certificates for transfer into his name.[87] In February 2002, Dave Hanson transferred five of the Gourmet Gifts certificates obtained from Mr. Farran to Irving Freiberg for his spam

---

[80] Exhs. 309, 310.

[81] Trial Tr. at 58.

[82] *Id.* at 56–58; Carmichael Depo. at 61–61, 192; Exh. 300.

[83] Trial Tr. at 53, 56–59; Exh. 35.

[84] Trial Tr. at 53, 56–59; Carmichael Depo. at 196–98.

[85] Exhs. 33, 51.

[86] Exhs. 35, 51.

[87] Exh. 35.

publicity campaign (discussed below).[88]  On January 23, 2002, after the merger, an additional 13,586,000 shares of Gateway stock were issued, diluting the shareholders' ownership.[89]

Mr. Carmichael admitted that it was wrong to agree to exchange cash for shares on behalf of Mr. Consalvi and Mr. Stilwell.  He indicated that, with the benefit of hindsight, he would not agree be involved in such a transaction in the future.  Mr. Carmichael regretted his involvement in the transaction, indicating that he had not directly benefitted from it in any way.[90]

(C)      Alleged Market Manipulation

Allan Freed, as a wholesale trader at vFinance in Florida, traded stock of public companies in various markets.[91]  As of 2001 to 2002, Mr. Freed had been in the securities industry for over 30 years and had been a trader since 1973 or 1974.[92]  Mr. Freed traded stocks in NASDAQ, the bulletin board, and the electronic pink sheets.  He traded stock through a computer system at his desk.[93]  Mr. Freed's supervisor at vFinance was Marc Siegel.[94]

As of May 2003, Mr. Freed had been acquainted with Mr. Carmichael for 8 years.[95]  He characterized Mr. Carmichael as a business associate.[96]  Mr. Carmichael also knew Marc Siegel

---

[88] Exh. 27.

[89] Exhs. 4, 35.

[90] Trial Tr. at 50, 79.

[91] Freed Depo. at 13 (May 21, 2003)

[92] Id.

[93] Id. at 13, 41.

[94] Id. at 27.

[95] Trial Tr. at 69; Freed Depo. at 13, 83 (May 21, 2003); Carmichael Depo. at 242.

[96] Freed Depo. at 83–84 (May 21, 2003).

and another vFinance trader.[97]  Mr. Carmichael had an account with Mr. Freed in which he traded

stock sometimes.[98]  Mr. Carmichael hoped to learn the trader business from Mr. Freed.[99]

In late 2001 or early 2002, Mr. Carmichael went to vFinance to discuss an investment

banking agreement between Gourmet Gifts and vFinance.[100]  Mr. Freed's understanding was that

the investment banking agreement was set up so vFiannce could raise money for Gateway and

sell the stock at retail.  The agreement did not relate to Mr. Freed's trading activities with Mr.

Carmichael.[101]  Mr. Carmichael told Mr. Freed that Gourmet Gifts would be merging with

another company, but Mr. Freed did not know the business of either Gourmet Gifts or of the

post-merger company, Gateway.[102]

Mr. Carmichael denied discussing with Mr. Freed the possibility of making a market in

Gourmet Gifts or Gateway stock.[103]  Instead, he said he simply introduced E.M. Tool to

vFinance.[104]  As interim president of Gourmet Gifts, Mr. Thomas negotiated, reviewed, and

executed the investment banking agreement with vFinance.  Mr. Thomas thought he provided the

company with a copy of the vFinance agreement.  Under the terms of the agreement, vFinance

agreed to promote Gateway stock in exchange for 20,000 shares.  Mr. Thomas arranged for

---

[97] *Id.* at 84–85.

[98] Trial Tr. at 77.

[99] *Id.* at 242; Carmichael Depo. at 264–65.

[100] Freed Depo. at 28, 31 (May 21, 2003).

[101] *Id.* at 31–32.

[102] *Id.* at 20–23.

[103] Carmichael Depo. at 263.

[104] Trial Tr. at 38–41, 43–48, 214–16, 250–51; Carmichael Depo. at 138–42.

vFinance to receive the stock.[105]

Mr. Carmichael admitted to calling (and trying to call) Mr. Freed quite often.  During November and December 2001, Mr. Carmichael called vFinance anywhere from 20 to 50 times a day.  On same days, Mr. Carmichael called vFinance as often as every ten minutes, according to his phone records.[106]  Mr. Freed also indicated that Mr. Carmichael called him often, but said he regularly had no time to talk to him, and told him to call back.  Or Mr. Freed provided Mr. Carmichael with information on price and volume.[107]  Also, some of Mr. Carmichael's calls may have been to others at vFinance — not to Mr. Freed.[108]

No trading market existed in Gourmet Gifts stock before November 2001.[109]  During this time, vFinance held the high bid on Gourmet Gifts stock on 75% of the trading days.[110]  Mr. Freed's trading constituted the majority of the trading in the stock.[111]  Occasionally, Mr. Freed even changed the bid when he already held the high bid in Gateway stock.[112]  And, at times, Mr. Freed raised his bid at the end of the trading day.[113]  But Mr. Freed had worked in the securities industry for 31 years and had never faced a regulatory or legal problem during this time.[114]

---

[105] Trial Tr. at 246–48, Exh. 55.

[106] Carmichael Depo. at 244, 264–66, 274–75.

[107] Freed Depo. at 90 (March 7, 2007); Freed Depo. at 100–01, 125 (May 21, 2003).

[108] Freed Depo. at 104–05 (May 21, 2003).

[109] Exh. 250.

[110] Exh. 255.

[111] Exh. 251.

[112] Freed Depo. at 13 (Aug. 25, 2003).

[113] *Id.*

[114] Freed Depo. at 74–77 (Mar. 7. 2007).

Mr. Freed testified four times — three times in 2003 (May 21, 2003; June 12, 2003; and August 25, 2003), and once on March 7, 2007.  In this third deposition, Mr. Freed indicated that he simply followed Mr. Carmichael's instructions as to where to set a bid at any given time.[115] Mr. Freed said he thought Mr. Carmichael was trying to artificially increase the price and volume of Gateway stock through his instructions to Mr. Freed.[116]  Mr. Freed explained that he stopped bidding at Mr. Carmichael's direction once Mr. Freiberg started his e-mail campaign.[117]  In two other depositions, Mr. Freed asserted that he controlled his own bid prices or that, at times, Mr. Siegel advised him when and how much to bid.[118]

In March 2007, Mr. Freed repeatedly indicated that all of his testimony is unreliable.[119] He testified to general problems with recall and memory, explaining that he has suffered from a nervous breakdown.[120]  Mr. Freed indicated that he took a medication used for schizophrenia, and that he had not worked in several years because he "couldn't function as a human being."[121]  Mr. Freed explained that he feels disoriented at times, has anger control problems, and suffers from suicidal thoughts.[122]  He was also under a psychiatrist's care at while he worked at vFinance.[123] In fact, Mr. Freed suffered from severe depression, memory problems, and other health problems

---

[115] Freed Depo. at 10, 12, 133 (Aug. 25, 2003).

[116] *Id.* at 58.

[117] *Id.* at 62–63.

[118] *See, e.g.*, Freed Depo. 97, 124, 134 (May 21, 2003); Freed Depo. 134 (Mar. 7. 2007).

[119] Freed Depo. at 58–59, 84, 112, 114–15, 117–19, 131–32, 139 (Mar. 7, 2007).

[120] *Id.* at 6, 15, 27–28, 31, 108–09.

[121] *Id.* at 26–29.

[122] *Id.* at 16, 22-23, 59–63.

[123] *Id.* at 30.

while working there.[124]  As of March 2007, Mr. Freed could not remember that he had testified

before the SEC three other times.[125]

      During his first deposition, Mr. Freed explained it was his decision whether to move the

market.  He explained that he always exercised independent judgment and took no directions

from Mr. Carmichael.[126]  During his second deposition, Mr. Freed testified that he makes a

market in the majority of the stocks in his portfolio by increasing the bid until he sees an order

flow.[127]  He used that trading pattern specifically for stocks with limited volume, and used the

strategy in the majority of the stocks he traded over the course of 31 years.  He indicated the

approach was typical and designed to maximize return for himself and for the firm.[128]  By his

third deposition, Mr. Freed's story had changed.  When the SEC began its investigation of

Gateway, Mr. Freed could not afford to fight the claims.[129]  After this, in August 2003, when Mr.

Freed was asked to leave vFinance, he became angry.[130]  Mr. Freed was asked to leave because of

"the thing with Harvey Carmichael."[131]  Just a few days later, Mr. Freed affirmatively contacted

the SEC and gave another deposition.  In this deposition, Mr. Freed recanted his earlier

statements and claimed that Mr. Carmichael had directed him to increase his bid price.[132]  Then,

---

[124] *Id.* at 5, 44, 52–57, 91, 98.

[125] *Id.* at 81–83.

[126] Freed Depo. at 97, 124, 134 (May 21, 2003).

[127] Freed Depo. at 6–8, 11–13 (June 12, 2001).

[128] *Id.* at 12–13 (June 12, 2001).

[129] Freed Depo. at 74–77 (Mar. 7. 2007).

[130] *Id.* at 62–63.

[131] *Id.* at 64.

[132] Freed Depo. at 6, 70–73 (Aug. 25, 2003)

in his fourth deposition, Mr. Freed explained he had no problems with Mr. Carmichael.[133]  He

also testified that at times, his boss, Marc Siegal, told him to raise or lower the price of the

stock.[134]  Finally, consistent with his first and second depositions, Mr. Freed testified that he

exercised independent judgment when setting the bid price.[135]

      When confronted about the inconsistencies in his testimony, Mr. Freed first offered no

explanation, then he suggested the medication led him to do it and that he was scared of Mr.

Carmichael.[136]  Finally Mr. Freed said that he had been "horsewhipped" by the SEC, claiming the

"investigative people" had "beat me down."[137]  He said he testified at a time when he was angry

at vFinance and felt humiliated by them.  When asked if his third deposition was reliable, Mr.

Freed answered, "I was browbeaten."[138]  When specifically asked about the conflicts with his

testimony in his third deposition, Mr. Freed indicated that his attorney "put words in my own

mouth."[139]  He further explained that his attorney told him what to say, even though some of it

was untrue.[140]  Mr. Freed noted that "I even called him to kind of like — not criticize him but,

you know, 'What are you doing?'  And, you know, he says, 'You paid me, and this is how we're

going to do it.'"[141] Ultimately, Mr. Freed admitted that his third deposition may not have been

---

[133] Freed Depo. at 85, 121 (Mar. 7, 2007).

[134] *Id.* at 104.

[135] *Id.* at 134.

[136] *Id.* at 112, 131–32.

[137] *Id.* at 113.

[138] *Id.* at 117.

[139] *Id.* at 114–18.

[140] *Id.*

[141] *Id.* at 118.

reliable.[142]  But despite this exchange during his fourth deposition, when asked if he had told the truth during each of his prior depositions, Mr. Freed flatly answered, "Yes."[143]

On November 5, 2001, Mr. Carmichael bought 50,000 shares of Gourmet Gifts stocks on the open market.[144]  He also bought and sold additional shares in 2001 and 2002.[145]  As of October 12, 2001, Gourmet Gifts reported 1,096,000 shares of stock as outstanding.  It was Mr. Freed's understanding that Mr. Carmichael also controlled his mother's Gateway shares.  But Ms. Langner only ever made one purchase and one sale of Gateway stock.[146]  It is undisputed that Mr. Carmichael never filed Forms 3, 4, 5, or 13D with the Commission.

(D)     *Fraudulent Publicity Campaign*

Irving Freiberg, Mr. Carmichael's co-defendant who consented to judgment in this case, promoted public companies by preparing and publishing their profiles on his web sites and sending out e-mail profiles to the public.[147]  Mr. Siegel introduced Mr. Carmichael to Mr. Freiberg.[148]  Mr. Freiberg only accepted new customers through referrals because he wanted to avoid being investigated.[149]

At a meeting in the offices of vFinance, Mr. Siegel, Mr. Freiberg, and Mr. Carmichael negotiated a deal relating to Mr. Freiberg's preparation and dissemination of a profile of

---

[142] *Id.* at 115–16.

[143] *Id.* at 130–31.

[144] Exh. 252.

[145] *Id.*

[146] Exh. 313.

[147] Trial Tr. at 99.

[148] Siegel Depo. at 83.

[149] Trial Tr. at 107–08.

Gateway.[150]  Mr. Siegel advised Mr. Freiberg that vFinance was making a market in the stock and that the stock price would be higher before Mr. Freiberg profiled it.  Mr. Siegel discussed the price to which he planned to raise the stock.[151]  Mr. Siegel, Mr. Freiberg, and Mr. Carmichael discussed more of their plans with regard to the promotion over dinner after the meeting.[152]

Mr. Freiberg understood that his deal with Mr. Carmichael regarding the publicity campaign had nothing to do with Gateway itself.  Mr. Carmichael was acting on his own behalf, and Mr. Carmichael alone was Mr. Freiberg's client.[153]  Mr. Siegel's understanding was that Mr. Carmichael and Mr. Freiberg had reached an agreement for Mr. Freiberg to promote Gourmet Gifts stock.[154]  Mr. Carmichael admitted to asking Mr. Freiberg to write up a profile on Gateway.[155]  The plan was then for Mr. Freiberg to disseminate the profile using e-mail databases.[156]

Mr. Carmichael admitted it was possible that he discussed compensation with Mr. Freiberg.[157]  Mr. Freiberg wanted to be compensated for his work in free-trading shares of the company, because they could be easily liquidated and their value would usually rise as a result of

---

[150] *Id.* at 108–09.

[151] *Id.* at 109.

[152] Freed Depo. at 35–37 (Aug. 25, 2003).

[153] Trial Tr. at 114–15, 117.

[154] Siegel Depo. at 34.

[155] Carmichael Depo. at 278.

[156] Trial Tr. at 115–17.

[157] Carmichael Depo. at 280.

his stock promotion.[158]  Mr. Carmichael promised to ensure Mr. Freiberg was paid.[159]  Dave

Hanson later contacted Mr. Freiberg.  Mr. Freiberg believed Mr. Hanson to be Mr. Carmichael's

nominee, but provided no factual basis for that belief.[160]  Mr. Freiberg sent Mr. Hanson his

consulting agreement.[161]  Mr. Hanson later transferred 112,000 shares for reissuance to Mr.

Freiberg.[162]  After Mr. Freiberg called Mr. Siegel to complain he had been underpaid, Mr.

Carmichael called Mr. Freiberg to assure him that he would receive the other 13,000 shares he

was owed.[163]

          At some point, Mr. Carmichael arranged a conference call between Mr. Freiberg and Mr.

Mouton.[164]  Mr. Mouton thought Mr. Freiberg was a possible financier for Gateway.  Mr. Panella

had instructed Mr. Mouton to provide financial information to Mr. Freiberg and a number of

others.[165]  Mr. Mouton ultimately sent information, including a business plan, to Mr. Freiberg via

e-mail.[166]  But Mr. Mouton was unaware Mr. Carmichael had retained Mr. Freiberg to prepare a

profile on Gateway.[167]  And Mr. Freiberg was unsure whether he sent Mr. Mouton a copy of the

profile to review.[168]  Mr. Mouton was the only person at Gateway who Mr. Freiberg discussed the

---

[158] Trial Tr. at 101–03.

[159] *Id.* at 115–17.

[160] *Id.* at 120–22.

[161] *Id.* at 119–20; Exhs. 315–16.

[162] Trial Tr. at 120; Exh. 13.

[163] Trial. Tr. at 122.

[164] *Id.* at 122–23.

[165] Mouton Depo. at 71–72; Trial Tr. at 122–24.

[166] Ex. 20; Trial Tr. at 122–24.

[167] Mouton Depo. at 79–80; 135; Exh. 22.

[168] Trial Tr. at 124, 181.

profile with — he does not know Mr. Consalvi or Mr. Panella.[169]  Mr. Consalvi denied that he

was aware Mr. Freiberg had prepared a profile on Gateway or that he had been paid with

Gateway stock.[170]

　　　　Before disseminating the profile, Mr. Freiberg sent a copy of it to Mr. Carmichael to

review.[171]  Mr. Freiberg then talked with Mr. Carmichael, and Mr. Carmichael approved the

profile Mr. Freiberg had sent.[172]  Mr. Freiberg had no access to Gateway's financial data, and he

lacked the experience and ability to confirm the accuracy of the information in the profile.[173]

Following this, on February 19, 2002, Mr. Freiberg disseminated the profile via e-mail to over

one million people.  He also posted it on his web site.[174]  Mr. Freiberg disseminated the profile

until March 6, 2002.[175]  It is undisputed that the profile contained material misrepresentations

about Gateway.  In fact, Mr. Freiberg testified that it was probably the worst he had ever prepared

in terms of misrepresentations.[176]

　　　　Dissemination of the profile ultimately failed to increase volume of Gateway stock

sales.[177]  When Mr. Siegel and Mr. Carmichael saw this, they called repeatedly, "screaming at"

---

[169] *Id.* at 132.

[170] Consalvi Depo. at 34–35.

[171] Trial Tr. at 124.

[172] *Id.* at 125, 128; Freiberg Depo. at 48–49.

[173] Trial Tr. at 124, 181.

[174] *Id.* 128–29, 136; Exh. 22.

[175] Trial Tr. at 129–30.

[176] *Id.* at 180.

[177] *Id.* at 129–30.

Mr. Freiberg "every second of the day," asking him "where is the volume?"[178]  Mr. Freiberg

discussed with Mr. Siegel and Mr. Carmichael the option of sending the profile out under

different brands to falsely create the appearance of widespread interest in it.  Mr. Siegel and Mr.

Carmichael told Mr. Freiberg to do "whatever it takes."[179]  Mr. Freiberg advised Mr. Carmichael

of the timing of his disseminations of e-mails about Gateway.[180]

A few weeks after initiating the Gateway campaign, Mr. Freiberg met with Mr.

Carmichael at Mr. Freiberg's offices.  Mr. Carmichael showed Mr. Freiberg a computer program

that would relay spam.  He asked Mr. Freiberg for the content of the profile he wrote up on

Gateway so that Mr. Carmichael could send it out directly.  Mr. Freiberg provided him with the

profile.[181]

On February 19, 2002, the day Mr. Freiberg first disseminated the Gateway profile, Mr.

Mouton received one of Mr. Freiberg's unsolicited spam e-mails.[182]  On February 24, 2002, Mr.

Mouton received a second spam message.[183]  Gateway then began to receive complaints from the

public about the unsolicited spam.  Gateway ultimately contacted the SEC about the e-mails,[184]

but Mr. Consalvi could not explain why it took Gateway until June 2002 to contact the SEC.[185]

Additionally, Gateway issued a press release disavowing and correcting the content of the e-

---

[178] *Id.* at 130.

[179] *Id.* at 131–33.

[180] *Id.* at 140.

[181] *Id.* at 141–46; 148–49.

[182] Exh. 16.

[183] Exh. 15.

[184] Mouton Depo. at 95–96, 107.

[185] Consalvi Depo. at 87–88.

mails.[186]

Mr. Freiberg was indicted for his fraudulent promotional activities regarding one company in the District of New Jersey.  He later pled guilty in an agreement covering illegal activities regarding 87 other companies, including Gateway.[187]  Mr. Freiberg forfeited everything he owned and agreed to cooperate with the government.  Under the agreement, if Mr. Freiberg does not tell the truth as a witness in any forum in which the government calls him as a witness, the plea will be stricken.[188]  Mr. Freiberg formally entered his guilty plea on January 5, 2005. But Mr. Freiberg has not yet been sentenced.[189]  If the Department of Justice finds Mr. Freiberg has provided substantial assistance, it will ask the judge to depart downward from the otherwise applicable guideline sentence range.[190]

When the SEC initially subpoenaed Mr. Carmichael to give investigative testimony, Mr. Carmichael asserted his Fifth Amendment privilege, refusing to testify to all issues concerning Gateway.  Mr. Carmichael later testified at a deposition and at trial.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based upon the above-described evidence, the court finds and concludes as follows:

## I.      Mr. Carmichael Is Not Subject to an Adverse Inference

The SEC has asked the court to draw an adverse inference against Mr. Carmichael from the fact that he asserted his Fifth Amendment privilege against self-incrimination during the

---

[186] *Id.* at 98–101, 108–09, 136–37.

[187] Exh. 311.

[188] Trial Tr. at 105–06.

[189] *Id.*; Exh. 311.

[190] Trial Tr. at 106.

SEC's investigation of the case.  The court finds that because Mr. Carmichael responded to all questions at a later deposition and testified at the trial, no adverse inference is necessary or appropriate.

Individuals are permitted to exercise their Fifth Amendment privilege in civil proceedings as well as criminal proceedings.  But courts can draw adverse inferences or presume a violation when a person invokes the Fifth Amendment privilege in a civil proceeding.[191]  Additionally, courts may, but are not required to, draw an adverse inference where a defendant who refuses to testify during an investigation later testifies in discovery.

In this case, an adverse inference against Mr. Carmichael is not warranted.  Although Mr. Carmichael exercised his Fifth Amendment privilege during the SEC's initial investigation, Mr. Carmichael answered the SEC's questions at a later deposition.  Mr. Carmichael also responded to the SEC's questions fully at trial.  Accordingly, there is no indication the SEC was deprived of a fair proceeding due to Mr. Carmichael's assertion of his Fifth Amendment privilege during the investigation.  As of the time of discovery, Mr. Carmichael had responded to all of the SEC's inquiries on a substantive level.  The SEC has provided the court with no instances where Mr. Carmichael wholly refused to answer a question or stonewalled the proceedings.

Ultimately, because Mr. Carmichael fully responded to the SEC's questions in his deposition and at trial, and because the SEC has not established it suffered prejudice from Mr. Carmichael's early invocation of his Fifth Amendment right, the court finds an adverse inference against Mr. Carmichael to be unwarranted.

---

[191] *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

II.     **Mr. Carmichael Violated No Reporting or Registration Provisions**

The SEC claims Mr. Carmichael violated reporting provisions by failing to file the appropriate reports while he allegedly owned more than five percent of Gateway's stock.  The SEC also alleges Mr. Carmichael violated registration provisions by failing to register his Gateway securities offerings.  The court finds Mr. Carmichael violated neither provision.

(A)     *Mr. Carmichael Violated No Reporting Provisions*

The SEC alleges Mr. Carmichael violated § 13(d) and § 16(a) of the Exchange Act by failing to file the appropriate reports as a beneficial owner of more than 5% and more than 10%, respectively, of a company's security.

Section 13(d) of the Exchange Act requires any person with direct or indirect beneficial ownership of more than 5% of an issuer's common stock to file a form (Schedule 13D) with the SEC within ten days after acquiring the stock.[192]  Similarly, § 16(a) of the Exchange Act requires beneficial owners of more than 10% of any class of stock to file reports with the SEC disclosing their purchases and sales of the issuer's stock.[193]  A beneficial owner is anyone who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote or to direct the voting of such security; and/or, (2) Investment power, which includes the power to dispose, or to direct the disposal of, such security."[194]  It is undisputed that Mr. Carmichael never filed reports pursuant to § 13(d) or § 16(a), but because the SEC has failed to prove Mr. Carmichael owned even 5% of a

---

[192] 17 C.F.R. § 240.13d-1(a).

[193] *Id.* § 240-16a-3.

[194] *Id.* § 240.13d-3(a).

company's stock on any given date, the SEC's reporting claims fail.

The SEC's evidence is simply insufficient to establish that Mr. Carmichael ever owned more than 5% of Gateway/Gourmet Gifts shares in his own name.  As of November 2001, Gourmet Gifts had 1,096,000 shares outstanding (5% of which is 54,800 shares).  Counting all of the Gateway/Gourmet Gifts stock Mr. Carmichael purchased in his name through his brokerage accounts, Mr. Carmichael never owned more than 52,500 shares on any given date.  He owned the most shares early in November 2001, then consistently sold shares (buying occasionally only minimal amounts) through the end of February 2002.  This is clear from the SEC's own summary of Mr. Carmichael's accounts.[195]  But rather than breaking the evidence down day-by-day, the SEC generalizes the brokerage account evidence, adding it to the percentages of others' shares the SEC alleges Mr. Carmichael controlled.  In other words, the SEC never points to a specific date — based on Mr. Carmichael's purchase records — and argues that as of that date, Mr. Carmichael owned more than 5%.  This is likely because the evidence from the purchase records does not support this conclusion.

The "sell" records summary, on the other hand, does apparently show Mr. Carmichael sold more than 5% of Gateway stock in his own name over a number of months.  But the SEC has not argued, in any detail, that the court should rely on the sell records in support of this claim, instead asking the court to rely on Mr. Carmichael's "buy" records.  The court will not craft the SEC's argument for it, so it does not look to the sell records as they relate to this claim.  Moreover, no balance sheet reconciles the markedly different quantities of stock reflected in the

---

[195] *See* Exh. 252.

buy and sell records.  In other words, nothing shows when Mr. Carmichael acquired his first

share, what quantity of shares he ended up with, and what transactions took him from this first

share through the end of the relevant time period.  In the absence of other evidence, that Mr.

Carmichael sold — in aggregate — more than 5% of the stock over a number of months does not

establish that on any one given day he owned more than 5% in his own name.  For this reason,

the sell records are not helpful with regard to this claim.

      Because the SEC has failed to show Mr. Carmichael owned more than 5% of

Gateway/Gourmet Gifts stock in his own name, the SEC could only prevail on its claim by

establishing that Mr. Carmichael beneficially owned additional stock held in the names of third-

party nominees.  Although the SEC has made numerous allegations that Mr. Carmichael's family

and friends purchased stock as Mr. Carmichael's nominees, the court can not reasonably make

this finding from the evidence.  Further, the SEC has failed to establish that Mr. Carmichael

retained control of the stock he picked up from Mr. Farran.

      The SEC has presented no credible evidence to support its allegation that Mr.

Carmichael's family and friends acted as his nominees in purchasing stock.  The SEC begins by

alleging Peggy Langer, Mr. Carmichael's mother, acted as a nominee for Mr. Carmichael.  But

Ms. Langner never admitted to being a nominee.  And, more important, considering Mr. Thomas'

testimony, it seems unlikely that Ms. Langner purchased Gateway/Gourmet Gifts on behalf of

anyone other than herself.  Mr. Thomas testified that Ms. Langner worked for him for about two

years and, during this time, Mr. Thomas discussed the reverse merger with her.  In other words,

Ms. Langner was independently made aware of the company's circumstances and opportunity to

buy stock.  Moreover, Ms. Langner only ever made a single purchase and a single sale of

Gateway stock.

Similarly, the SEC failed to present any evidence that Mr. Carmichael's sister, Gloria Morton, acted as a nominee for Mr. Carmichael. Indeed, Ms. Morton credibly testified that she acted only on her own behalf and controlled her own shares. In short, the SEC presented no evidence Mr. Carmichael controlled any shares in the names of others.

The SEC's final argument with regard to these reporting provisions relates to the assertion that Mr. Carmichael's purchases of stock on the behalf of his father and Mr. Consalvi were actually purchases on his own behalf. The SEC basically alleges that Mr. Carmichael retained control of the stock he received from Kim Farran, maintaining the power to dispose of it. If true, Mr. Carmichael would have owned at least 178,000 shares — more than 5% of the outstanding shares as of the time he received them from Mr. Farran. But this argument fails on a number of grounds.

First, although the details of the actual transaction are largely undisputed, the SEC offers little evidence from which the court can infer Mr. Carmichael retained control of the stock he received. Instead, the SEC relies only on supposition and insufficient circumstantial evidence. Mr. Carmichael admitted meeting Mr. Farran in an airport in Reno, Nevada, and exchanging around $13,000 in cash for a number of Gourmet Gifts certificates. But this was Mr. Carmichael's first substantive contact with Mr. Farran — Mr. Farran had no real conversations with Mr. Carmichael before meeting with him at the airport. It was Mr. Stilwell who first approached Mr. Farran about the sale, and Mr. Farran arranged the details of the sale with either Mr. Stilwell or Mr. Thomas. Mr. Farran relied on Mr. Stilwell's advice regarding this transaction and relied on Mr. Stilwell in gathering up the endorsed stock certificates from the investors.

The SEC contends Mr. Carmichael's claimed unawareness of the details of the transaction establishes Mr. Carmichael's lack of credibility.  But it is reasonable to think a person acting entirely on behalf of others would not immerse himself in the details of the transaction.  Indeed, Mr. Farran, who was also acting on behalf of others, was similarly unsure of exactly how much money he received in exchange for the stock.  The SEC also alleges Mr. Carmichael's version of events repeatedly changed.  But this does not accurately reflect the evidence.  Rather than contradictions, the record establishes Mr. Carmichael had some difficulty with recall.  Mr. Carmichael forthrightly admitted at the outset that the did not remember some details of the transaction or the order in which he took certain actions.  But Mr. Carmichael was able to provide the court with enough information to ascertain what occurred — if not the exact timing of the events.

The SEC also relies heavily on Mr. Consalvi's denials to support its claim that Mr. Carmichael acted on his own behalf.  Mr. Consalvi denied knowledge of the airport transaction and denied receiving any shares from the transaction.  But Mr. Consalvi is not a disinterested witness in this case.  First, Mr. Consalvi was CEO of Gourmet Gifts.  If he admitted to any control of or interest in the certificates from Mr. Farran, he might well be in violation of numerous securities laws, including the reporting requirements at issue here.  As a control person of Gateway, any stock he owned or purchased would automatically be restricted.[196]  Mr. Carmichael explained that both he and Mr. Carmichael recognized this at the time of the transaction.  Indeed, Mr. Consalvi asked Mr. Carmichael to transfer the shares into others' names

---

[196] 17 C.F.R. § 230.144(k); *see also* Trial Tr. at 234–35.

precisely because he could not own them without restriction.  Second, Mr. Consalvi and Gateway are involved in litigation with Mr. Carmichael over the stock certificates Mr. Carmichael received from his father.  The outcome of that suit conceivably may be affected by any admission of interest in the stocks by Mr. Consalvi.  In light of these circumstances, Mr. Consalvi's denials fail to convince the court that Mr. Consalvi had no interest in the shares or that Mr. Carmichael retained control over them.

Additionally, at least some documentary evidence supports Mr. Carmichael's explanation of events.  All of the original Gourmet Gifts certificates were numbered 1001 through 1043.  Mr. Farran identified the stock certificates he gave to Mr. Carmichael in Reno from the list of original stockholders.[197]  Mr. Farran and Mr. Carmichael met in Reno in about October 2001. And according to stock transfer records, five of the original certificates Mr. Farran identified — 80,000 shares — were transferred to five individuals on November 1, 2001.  Mr. Carmichael testified that it was these individuals — Rick Smith, Steve Clark, Dave Hanson, Jeff Christiansen, and Brad Wilkerson — to whom Mr. Consalvi directed him to transfer the stock. This claim is supported by the list Mr. Consalvi gave Mr. Carmichael with the names, addresses, and share amounts of each of the individuals.  The voting control and power to dispose of these shares belonged to these individuals once the stock had been transferred to them.  The SEC presented no evidence that these individuals were nominees of Mr. Carmichael.  And the SEC has not refuted the documentary evidence regarding the transfers.

The SEC also focuses on the fact that Mr. Carmichael personally used of a couple of the

---

[197] Exh. 51.

share certificates, alleging it shows Mr. Carmichael retained control of all of the certificates.  But Mr. Carmichael forthrightly admitted he kept two of the share certificates and used them personally.  Besides transferring the certificates at Mr. Consalvi's request, Mr. Carmichael explained that he gave five to his father, kept two for himself, and gave the rest to Mr. Consalvi.  Then, shortly before Mr. Carmichael's father died in 2003, his father returned the five certificates to Mr. Carmichael.  Mr. Carmichael tried to transfer the shares into his own name at that time, but Gateway and Mr. Consalvi stopped the transfer.  Gateway, Mr. Consalvi, and Mr. Carmichael are currently involved in litigation regarding these shares.  The SEC also points out that one additional share obtained from Mr. Farran was transferred, but there is no evidence as to who effected the transfer.  And in January and April 2002, Mr. Stilwell presented four of the stock certificates for transfer into his own name.  But again, the SEC has offered no evidence (beyond supposition) tying this to Mr. Carmichael.  More concerning is the evidence that, in May 2002, Mr. Carmichael presented a certificate obtained from Mr. Farran for transfer into his own name.  But Mr. Carmichael's possession of this singular certificate (and lack of explanation for it) is far from sufficient to prove that Mr. Carmichael kept control of the other certificates he obtained from Mr. Farran.  And the SEC does not allege Mr. Carmichael's possession of this single certificate — even in addition to the two others he admitted keeping and the shares he purchased in his own name — gave him ownership of more than 5% of Gateway's outstanding stock.

Considering all of these facts, the court cannot reasonably find that Mr. Carmichael retained control of any more than three of the stock certificates he obtained from Mr. Farran.  And the SEC has failed to show that these certificates combined with Mr. Carmichael's own purchases gave him ownership or control of more than 5% of the outstanding stock at any one

time.  Because of this, Mr. Carmichael had no obligations under either § 13(d) or § 16(a) of the

Exchange Act, and the SEC's claims under these sections fail.

    *(B)    Mr. Carmichael Violated No Registration Provisions*

In a summary fashion, the SEC alleges Mr. Carmichael violated registration provisions.

But the court finds Mr. Carmichael had no obligation to register his offerings because the shares

Mr. Carmichael sold were freely tradeable shares acquired on the open market and Mr.

Carmichael was not an affiliate of Gateway.

Section 5 of the Securities Act requires the registration of all securities offerings, subject

to some exemptions.  Specifically, § 5(a) prohibits the sale or delivery of securities through

jurisdictional means after a sale, unless a registration statement is in effect.[198]  Additionally, §

5(c) prohibits the use of jurisdictional means of offering to sell securities unless a registration

statement has been filed.[199]  If the SEC establishes the securities at issue were not registered and

were sold in interstate commerce or communication, the defendant has the burden to establish

that he was exempt from registration.[200]  Transactions by people other than issuers, underwriters,

and dealers are exempt from registration under § 4(1) of the Securities Act.[201]  This is the

exemption used by ordinary investors trading on the open market.  The SEC makes no claim Mr.

Carmichael qualifies as an issuer or dealer, only that Mr. Carmichael qualifies as an underwriter.

The relevant definition of "underwriter" is a person who purchased from an issuer with a

---

[198] 48 Stat. L. 77, § 5 (1933).

[199] *Id.*

[200] *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

[201] 48 Stat. 77, § 4 (1933).

view to the distribution of the security.[202]  But Rule 144 provides a safe harbor in some

circumstances from being considered an underwriter.  Under two different sets of circumstances,

a non-affiliate seller may escape from being deemed an underwriter pursuant to Rule 144.

> First, the SEC has generally removed all restrictions from the sale of securities by a
> non-affiliate who has held onto the securities for a period of at least two years from
> the date the securities were acquired from the issuer or an affiliate of the issuer.  17
> C.F.R. § 230.144(k).  If the non-affiliate seller has not held the securities for a period
> of at least two years, the seller may fall within the Rule 144 safe harbor if it complies
> with [the volume limitation and disclosure requirements of Rule 144].[203]

It is undisputed that the securities Mr. Carmichael sold were unregistered and sold in

interstate commerce or communication.  And the SEC alleges, in a conclusory fashion, that Mr.

Carmichael held a control position in Gateway stock at all relevant times, so he was an affiliate

seller.  But the SEC does not offer any real evidence in support of this claim.  Indeed, the SEC

fails to discuss the factual circumstances at all.  Mr. Carmichael, on the other hand, offers

evidence to establish that he did not qualify as an affiliate.

An affiliate "is a person that directly, or indirectly through one or more intermediaries,

controls, or is controlled by, or is under common control with, such issuer."[204]  For the purposes

of Rule 144, "control" is defined as the "possession, direct or indirect, of the power to direct or

cause the direction of the management and policies of a person whether through the ownership of

voting securities, by contract, or otherwise."[205]  The affiliate inquiry is based on the totality of the

circumstances, "including an appraisal of the influence upon management and policies of a

---

[202] 15 U.S.C. § 77b(11).

[203] *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 213 (3d Cir. 2006).

[204] 17 C.F.R. § 230.405.

[205] *Id.*

corporation by the person involved."[206]  Affiliates are most often officers, directors, or majority

shareholders — people who exercise control and influence over the company's policies or

finances.  In this case, the SEC presented no evidence Mr. Carmichael was involved in

Gateway's governance, policies, strategies, or decisions.  None of Gateway's principals testified

to being influenced by Mr. Carmichael.  And as the court determined, Mr. Carmichael never

owned more than 5% of the outstanding stock at any one time, so he could exert no significant

influence through his stock ownership.  It would simply not be reasonable to find Mr. Carmichael

occupied the type of control position contemplated by Rule 144.  Therefore, the court has no

choice but to find he did not occupy the position of an affiliate.

As a non-affiliate, Mr. Carmichael was not subject to the registration provisions, as all of

the restrictions on the stock had expired by the time Mr. Carmichael purchased it.  In other

words, the stock was freely tradeable.  The SEC does not dispute that Gourmet Gifts publicly

offered its securities under Rule 504 of Regulation D in September 1998.[207]  Therefore, for non-

affiliate sellers, all restrictions expired in September 2000, two years later.  According to the

SEC's own evidence, Mr. Carmichael bought and sold stock in three different accounts

beginning in Fall 2001.  This places his sales more than one year after the Gourmet Gifts stock

would have been freely tradeable for non-affiliates under the safe harbor rule.  After this

expiration period, no later sales of non-affiliates would need to be registered or exempted.[208]  In

other words, neither Mr. Carmichael nor other non-affiliates would need to comply with holding

---

[206] *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976).

[207] *See* 17 C.F.R. §§ 230.501–08.

[208] *See* 17 C.F.R. 230.144(k).

period or volume limitations in § 5.  Therefore, the SEC's arguments regarding Mr. Carmichael as an underwriter are irrelevant.

The SEC offers no response to Mr. Carmichael's arguments — it neglected to argue its registration violation claim at all in its reply.  This apparent concession of the claim by the SEC is fitting in light of the fact that the stock was freely tradeable as of the expiration of the two year holding period.  In short, the SEC has flatly failed to establish Mr. Carmichael's liability under the registration provisions of the Securities Act.

**III.   Mr. Carmichael Violated Antifraud Provisions by Conducting a Publicity Campaign, but Not by Engaging in Manipulative Trading**

The SEC alleges that Mr. Carmichael committed fraud in violation of securities regulations in two ways.  First, the SEC claims Mr. Carmichael engaged in manipulate trading, by directing Mr. Freed's bids in an attempt to make a market in Gateway stock.  Next, the SEC alleges Mr. Carmichael orchestrated a fraudulent publicity campaign for Gateway stock with Mr. Freiberg.

*(A)   The Evidence Is Insufficient to Show Mr. Carmichael Engaged in Manipulative Trading*

The SEC contends that Mr. Carmichael directed Mr. Freed to make a market for Gateway stock in a manner intended to mislead investors.  The court finds that while the SEC's claims about Mr. Carmichael's involvement in the market manipulation scheme with Mr. Freed are plausible, the SEC has failed to meet its burden of proof regarding this claim.

Section 10(b) of the Exchange Act (and the associated rules) prohibit the use of

manipulative or deceptive devices in connection with the purpose or sale of a security.[209]  These

provisions prohibit all practices "intended to mislead investors by artificially affecting market

activity."[210]  Manipulative activities include acts meant to interfere with the natural forces of

supply and demand, and conduct designed to deceive or defraud investors by artificially

controlling or affecting the prices of securities.[211]

At the outset, the SEC claims Gateway's stock rose without connection to any public

developments at the company.  There is, however, evidence of public disclosures that might have

affected the stock price.  For instance, on October 24, 2001, Gourmet Gifts reported a change in

the control of the company, when Mr. Thomas became the president.  Then, on October 26,

2001, Mr. Thomas sent a letter to shareholders explaining that he was the new president and

announcing the possibility of a merger.  On November 9, 2001, a press release was issued

announcing that a letter of intent for the merger had been signed.  Then on November 21, 2001, a

four-for-one forward split was announced.  On December 11, 2001, Gourmet Gifts signed the

reorganization agreement with E.M. Tool.  Then, on December 12, 2001, a press release

announced the merger.

While these disclosures provide at least some reasoned explanation for some of the price

increases, they do not sufficiently explain the stock activity.  For one thing, the price increases

and trading in question continued well beyond the period of public disclosures, ending December

2001.  For another thing, these disclosures do not sufficiently explain vFinance's domination of

---

[209] 15 U.S.C. § 78j.

[210] *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

[211] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976).

the stock during the relevant time period.  vFinance held the inside bid on the stock for about

75% of its total trading hours.  Moreover, at times, vFinance raised its own exclusive inside bid.

And on five dates, trading by vFinance represented between 65% and 100% of the total trading

volume.  This cannot reasonably be seen as anything but an attempt to artificially inflate the

market.  Put another way, the court finds that some manipulation of the market for Gateway stock

occurred.

     The problem with the SEC's claim is that Mr. Freed's and vFinance's participation in

some market manipulation does not serve to establish Mr. Carmichael's liability.  The SEC has

simply failed to meet its burden in establishing that Mr. Carmichael caused or directed the

market manipulation.  The SEC claims Mr. Freed traded and set the bid price on Gourmet

Gifts/Gateway stock at Mr. Carmichael's direction.  But in support of this allegation, the SEC

relies almost solely on the testimony of Mr. Freed.  This reliance is problematic considering that

Mr. Freed's testimony lacks credibility.

     Mr. Freed testified in this case four different times — three times in 2003 and one time in

March 2007.  In 2007, Mr. Freed repeatedly indicated that all of his testimony is unreliable.  Mr.

Freed also testified to his lack of memory and claimed that taking his medications negatively

affected his recall and memory.  Additionally, Mr. Freed indicated that he took medication used

for schizophrenia, and that he had not worked in several years because he "couldn't function as a

human being."[212]  Mr. Freed explained that he feels disoriented, has anger control problems, and

suffers from suicidal thoughts.  Mr. Freed was also under a psychiatrist's care while he worked at

---

[212] Freed Depo. at 26–29, 64 (Mar. 7, 2007)

vFinance, suffering from severe depression and memory problems.  As of March 2007, Mr. Freed could not remember that he had testified before the SEC three other times.

During his first deposition, Mr. Freed explained it was his decision whether to move the market.  He maintained that he always exercised independent judgment and took no directions from Mr. Carmichael.  During his second deposition, Mr. Freed testified that he makes a market in the majority of the stocks in his portfolio by increasing the bid until he sees an order flow, just as he did with Gateway/Gourmet Gifts.  He used that trading pattern specifically for stocks with limited volume, and used the same strategy in the majority of the stocks he traded over the course of 31 years.  He indicated the approach was typical and designed to maximize return for himself and for his firm.

By his third deposition, Mr. Freed's story had changed.  When the SEC began its investigation of Gateway, Mr. Freed could not afford to fight the claims.  And in August 2003, Mr. Freed was asked to leave vFinance because of "the thing with Harvey Carmichael" — at this point he felt angry and humiliated.  A number of days after being fired, Mr. Freed affirmatively contacted the SEC and gave another deposition.  In this deposition, Mr. Freed recanted his earlier statements and claimed that Mr. Carmichael had directed him to increase his bid price.  Then, in his fourth deposition, Mr. Freed explained he had no problems with Mr. Carmichael.  He also testified that at times, his boss, Marc Siegal, told him to raise or lower the price of the stock.  Some parts of his fourth deposition supported the accusations against Mr. Carmichael, but others did not.  For instance, consistent with his first and second depositions, Mr. Freed testified that he exercised independent judgment when setting the bid price.

When confronted about the inconsistencies in his testimony, Mr. Freed first offered no

explanation, then he suggested his medications led him to do it and that he feared Mr. Carmichael.  Finally, Mr. Freed said that he was "horsewhipped" by the SEC, claiming the "investigative people" had "beat me down."[213]  When specifically asked about the conflicts with the testimony he gave in his third deposition, Mr. Freed indicated that his attorney "put words in my own mouth," some of which were untrue.[214]  Mr. Freed explained, "I even called him to kind of like — not criticize him but, you know, 'What are you doing?'  And, you know, he says, 'You paid me, and this is how we're going to do it.'"[215]  When asked if his third deposition was reliable, Mr. Freed answered, "I was browbeaten."[216]  Ultimately, Mr. Freed admitted that his third deposition may not have been reliable.  Interestingly, despite this exchange during his fourth deposition, when asked if he had told the truth during each of his prior depositions, Mr. Freed flatly answered, "Yes."

In light of all of this, the court cannot ascertain which parts of Mr. Freed's testimony are truthful and accurate and which are not.  From Mr. Freed's testimony, it is simply impossible to tell how big of a role Mr. Carmichael played in Mr. Freed's manipulation of Gateway's market for shares.  It seems quite plausible that circumstances unfolded exactly as the SEC posits and exactly as Mr. Freed described in his third deposition.  But in light of the admitted unreliability of Mr. Freed's testimony, it is simply not clear enough to the court that this is what occurred to find Mr. Carmichael liable of this violation.

---

[213] Freed Depo at 113 (Mar. 7, 2007).

[214] *Id.* at 114.

[215] *Id.* at 118.

[216] *Id.* at 117

Furthermore, Mr. Carmichael was not the only person who stood to gain from manipulating Gateway's stock.  Mr. Freed, Mr. Siegel, and vFinance itself all stood to gain from raising the bid.  Market making is a common (and often legal) practice involving the purchase and sales of securities as a principal for an account.  By trading in the securities, the trader, in effect, "makes a market" in them.  The trader's profit is the difference between his sell price and his buy price.  Accordingly, if Mr. Freed successfully raised the bid, he would make money for himself and for vFinance.

In support of its claim, the SEC also focuses on the number of phone calls Mr. Carmichael made to vFinance.  But Mr. Carmichael explained he usually called to obtain real-time stock quotes from Mr. Freed, since they were not widely available in 2001.  Mr. Freed testified that he often had no time to talk with Mr. Carmichael when he called and that during some calls, he would give Mr. Carmichael information on price and volume.  Additionally, Mr. Freed indicated that some of Mr. Carmichael's calls could have been for Mr. Siegel or others in the firm.  To the court, these repeat phone calls provide at least some circumstantial evidence of a plan or scheme by Mr. Carmichael and Mr. Freed — but the court has no way of knowing the roles of the parties in the scheme.  In other words, the court cannot know the degree of Mr. Carmichael's influence or participation.  Mr. Carmichael has denied the calls involved any market making activities and Mr. Freed is simply not credible in his explanations.

Additionally, Mr. Freed had 31 years of experience in the market, and followed his usual practices in this case.  Mr. Carmichael, on the other hand, was relatively new to the business.  This cuts against the inference that Mr. Freed bowed to pressure to follow Mr. Carmichael's orders.  Finally, although Mr. Carmichael introduced E.M. Tool to vFinance, Mr. Thomas

negotiated, reviewed, and executed the investment banking agreement with vFinance.  Under the terms of the agreement, vFinance agreed to promote Gateway stock in exchange for 20,000 shares, so Mr. Thomas arranged for vFinance to receive the stock.  In other words, Gateway's relationship with vFinance was not arranged by Mr. Carmichael alone.

In sum, although the court finds the market for Gateway stock was unlawfully manipulated, the SEC has not proven Mr. Carmichael participated in the manipulation such that he could be held liable under the Exchange Act.  Although the SEC's version of events is quite plausible, the evidence to back it up is simply not in the record.

   (B)   *Mr. Carmichael Participated in a Manipulative Publicity Campaign*

In addition to its other claims, the SEC alleges Mr. Carmichael arranged with Mr. Freiberg to conduct a fraudulent publicity campaign for Gateway stock.  The court finds the SEC has established Mr. Carmichael's reckless participation in the campaign.

In addition to barring the use of manipulative devices, § 10(b) of the Exchange Act (and the associated rules) prohibits a person from employing a fraudulent scheme or making material misrepresentations or misleading statements in connection with the purchase or sale of securities.[217]  Under § 10(b), a primary violator is "one who participated in the fraudulent scheme."[218]  Therefore, even those who have knowledge of the fraud and assist in its preparation face primary liability.[219]  To be actionable under § 10(b), material misstatements must be made

---

[217] *See Ernst*, 425 U.S. at 197.

[218] *SEC v. United States Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) (internal quotations and citation omitted).

[219] *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471–72 (2d Cir. 1996).

with scienter.[220]  Knowing or reckless conduct meets this scienter requirement.[221]  Recklessness involves "an extreme departure from the standards of ordinary care" presenting a "danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[222]

Whether the profile Mr. Freiberg created contained material misrepresentations is not at issue.  The SEC established this at trial, and Mr. Carmichael does not dispute this fact.  Similarly, it is undisputed that the misrepresentations were connected with the purchase or sale of securities.  The only contested factor is whether Mr. Carmichael participated in the material misrepresentations with the requisite scienter such that he can be held liable under § 10(b).  The court finds that even if Mr. Carmichael did not act knowingly, he acted recklessly with regard to the making of the material misrepresentations.

The SEC alleges Mr. Carmichael violated § 10(b) by recklessly causing the issuance of a fraudulent profile for Gateway and then approving the profile.  Mr Freiberg's testimony is key to this claim.  The court finds Mr. Freiberg's testimony to be quite credible.  He directly and forthrightly answered all questions posed to him, admitting to his wrongdoing and illegal conduct in a straightforward and matter-of-fact way.  He also admitted to lapses in memory where appropriate.  And importantly, Mr. Freiberg corrected the questioning attorneys when he thought they were misrepresenting the facts or his testimony.

---

[220] *Ernst*, 425 U.S. at 193.

[221] *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982).

[222] *Id.* (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

Mr. Freiberg testified that Mr. Carmichael, not others at Gateway, hired him to promote Gateway's stock.  Mr. Carmichael was Mr. Freiberg's client — not Gateway or any of its principals.  Mr. Freiberg trusted Mr. Siegel, and he only accepted work from personal references because he never wanted to be compromised by an undercover investigation.  Because Mr. Siegel referred him, Mr. Freiberg was willing to accept Mr. Carmichael as a client.  Significantly, Mr. Carmichael participated in all the key conversations with Mr. Freiberg.  For instance, Mr. Carmichael attended the meeting where Mr. Siegel told Mr. Freiberg he was making a market for Gateway stock and relayed the share price to which he planned to raise the stock.  Additionally, Mr. Siegel and Mr. Carmichael both negotiated with Mr. Freiberg regarding his compensation, and it was Mr. Carmichael who promised to ensure Mr. Freiberg received payment.

Moreover, Mr. Carmichael did more than just arrange the deal — he facilitated the creation of the profile.  Mr. Carmichael put Mr. Freiberg into contact with Mr. Mouton to obtain official company information about Gateway.  Additionally, when Mr. Freiberg received 112,000 shares instead of the agreed-upon 125,000, Mr. Freiberg called Mr. Siegel to complain.  But it was Mr. Carmichael who called him back and promised the remainder of the shares.  And both Mr. Siegel and Mr. Carmichael called Mr. Freiberg repeatedly to confront him when Mr. Freiberg's first profile failed to produce the desired stock activity.  Finally, Mr. Freiberg called Mr. Carmichael to advise him of the timing of his dissemination of the e-mails on Gateway.

Mr. Mouton testified that Mr. Panella (Gateway's investment relations director) told him it would be permissible to provide Mr. Freiberg (and others) with Gateway's corporate information.  But Mr. Mouton had no indication Mr. Carmichael and Mr. Freiberg were involved in any kind of a publicity deal.  Instead, he thought Mr. Freiberg was a possible source of

financing for the company.  Mr. Mouton also did not remember much about the substance of his

conversation with Mr. Freiberg.  Further, while Mr. Freiberg knew he had sent a draft of the

profile to Mr. Carmichael, he was unsure if he sent a draft to Mr. Mouton for review.  He

testified that he thought Mr. Mouton knew about the campaign, but he never spoke to anyone

else from Gateway about it.  Mr. Freiberg also denied knowing Mr. Panella or Mr. Consalvi.

Even Mr. Carmichael admitted he never discussed the publicity arrangement with Mr. Consalvi.

       Ultimately, Mr. Mouton sent the corporate information to Mr. Freiberg on February 18,

2002.  Then, Mr. Mouton received the profiles Mr. Freiberg created on February 19, 2002 and

February 24, 2002.  Mr. Carmichael tries to characterize Exhibits 15 and 16 as drafts of the

profile Mr. Freiberg supposedly sent to Mr. Mouton for review.  But inspection of the exhibits

reveals they are e-mails sent as part of the spam campaign, not drafts of the profiles.  The e-mail

dissemination dates also support this finding.  Mr. Mouton received the first spam e-mail on

February 19, 2002, and Mr. Freiberg admitted to starting the campaign on February 19, 2002 or

February 20, 2002.  Mr. Mouton expressed his surprise when he received the spam e-mails, and

he testified to taking quick action to correct any misrepresentations they caused.  Specifically, he

contacted the SEC and issued a corrective press release publicly disclaiming the contents of the

e-mails.

       Mr. Carmichael even negotiated and arranged for Mr. Freiberg's compensation.  Mr.

Carmichael himself admits it is possible he discussed compensation with Mr. Freiberg.

Apparently, Mr. Carmichael told Mr. Freiberg that Dave Hanson would contact him, finalize the

agreement, and follow through with a payment.  Mr. Hanson ultimately contacted Mr. Freiberg

and entered into a consultation agreement with him, then transferred stock to Mr. Freiberg.  The

free-trading stock Mr. Hanson transferred was some of the same stock Mr. Carmichael picked up

from Mr. Farran in Reno.  Both parties rely on this fact as circumstantial evidence in support of

their respective claims.  The SEC alleges that because no evidence shows Mr. Consalvi had

custody of the shares, Mr. Hanson transferred them to Mr. Freiberg as Mr. Carmichael's

nominee.  Mr. Freiberg testified he did believe Mr. Hanson to be Mr. Carmichael's nominee, but

he provided no basis (outside of his own speculation) for that understanding.  Mr. Carmichael, on

the other hand, argues Mr. Hanson's involvement establishes Mr. Consalvi's role in hiring Mr.

Freiberg because Mr. Hanson was Mr. Consalvi's nominee — Mr. Consalvi directed Mr.

Carmichael to transfer some of the shares obtained from Mr. Farran to Mr. Hanson.  But the

court has already determined that the SEC presented insufficient evidence to establish Mr.

Carmichael retained control of these shares.  And for the same reasons the court found Mr.

Consalvi's denials to be suspect with regard to exchange of stock at the airport, they are suspect

here.  Even if Mr. Carmichael worked in conjunction with Gateway in hiring Mr. Freiberg, for a

finding of liability under § 10(b) there is no requirement that the defendant have acted alone.

Mr. Carmichael argues his own trade records fail to support the theory that he hired Mr.

Freiberg to fraudulently promote the stock in order to benefit economically.  Mr. Freiberg

disseminated the profile between February 19, 2002 and March 9, 2002.  On the start date of the

campaign, when the price of Gateway stock was at a relative high, Mr. Carmichael sold 5600

shares of stock.  He sold 1000 shares on February 26, 2002, and 1000 shares on February 27,

2002.  Then, he made no other sales until May 15, 2002.  But more than it reflects a lack of intent

to profit from Mr. Freiberg's activities, this sales pattern reflects the unsuccessful nature of Mr.

Freiberg's campaign.  Mr. Freiberg himself called the campaign a "dud," explaining that Mr.

Siegel and Mr. Carmichael were "screaming at" him "every second of the day" asking "where is the volume?"[223]

Finally, Mr. Carmichael must have been aware of the fraudulent nature of Mr. Freiberg's activities.  For one thing, Mr. Freiberg stated unequivocally in his investigative testimony that Mr. Carmichael approved the draft profile Mr. Freiberg sent for his review.  In his trial testimony, Mr. Carmichael indicated he had no reason to doubt the veracity of that statement.  Further, Mr. Carmichael told Mr. Freiberg to do "whatever it takes" to generate market interest.  Mr. Carmichael even discussed various fraudulent tactics with Mr. Freiberg, such as sending out e-mails in different names to create false appearances that different sources had interest in Gateway stock.  Also, Mr. Carmichael had a demonstrated interest in distributing Mr. Freiberg's profile.  Mr. Carmichael showed Mr. Freiberg a computer program he planned to use to distribute the profile himself, and Mr. Carmichael requested that Mr. Freiberg provide him the contents of the profile so that he could send it out directly.

Mr. Carmichael's participation demonstrates — at the very least — serious recklessness with regard to Mr. Freiberg's fraud.  Mr. Carmichael argues that because he had no access to Gateway's financial information, he had no way to know the information Mr. Freiberg released was false.  But this argument cuts against Mr. Carmichael — it was reckless of Mr. Carmichael to approve a profile for widespread public dissemination knowing he had none of the financial information or knowledge necessary to verify it.  This constitutes an extreme departure from ordinary standards of care.  Further, Mr. Carmichael likely knew parts of the profile were false.

---

[223]  Trial Tr. at 130.

For instance, Mr. Carmichael approved a profile claiming wildly inflated projected revenues of $20 to $25 million.  In other words, Mr. Carmichael orchestrated and authorized the release of information to the public that he had no way of knowing was correct, under circumstances that should have made him wary.

In the end, a few things are clear.  First, Mr. Freiberg was heavily involved in market manipulation through fraudulent spamming.  Next, Mr. Carmichael played an active role in Mr. Freiberg's scheme such that he must have known that Mr. Freiberg was acting fraudulently. Finally, at a minimum, Mr. Carmichael acted recklessly in his participation in this fraudulent scheme.  Therefore, the court finds Mr. Carmichael liable for this § 10(b) violation.

## IV.    Mr. Carmichael's Acts Merit Disgorgement, But Not an Injunction

The SEC has asked the court both to enjoin Mr. Carmichael and to order disgorgement of all of his proceeds.  While an injunction is unwarranted, the court finds it necessary to order disgorgement.

### (A)    The SEC Has Not Shown the Necessity of Injunctive Relief , an Officer/Director Bar, or a Penny Stock Bar

An injunction based on securities violations is appropriate where the SEC has shown a reasonable and substantial likelihood that the defendant will violate the securities laws in the future if not enjoined.[224]  To determine the likelihood of a future violation, the court considers such things as "the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations, and whether defendant has recognized

---

[224] *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).

his wrongful conduct and given sincere assurances against future violations."[225]  No single

factors dominates, but the scienter inquiry "bears heavily" on the decision.[226]

Analyzing these factors, the court sees no need for an injunction.  There is no evidence

Mr. Carmichael ever obtained beneficial ownership or control of more than 5% of the

outstanding shares of a public company, and the evidence is insufficient to establish that he

artificially inflated the stock.  Although the SEC successfully proved that Mr. Carmichael

purposefully engaged in a scheme to falsely tout the stock, the SEC has only definitively

established that he acted recklessly.

Moreover, no credible evidence establishes that Mr. Carmichael has engaged in such

conduct at any other time.  Only Mr. Freed, whom the court found to lack credibility, intimated

that Mr. Carmichael had been involved in other questionable conduct.  Mr. Carmichael's

occupation might present opportunities for future securities violations, but there is no evidence

he has participated in a violation since the events at issue here — although more than five years

have passed.  The mere fact that Mr. Carmichael has continued his involvement in the corporate

arena does not justify an injunction.  Indeed, according to the SEC, Mr. Carmichael's corporation

has posted no revenue over the past year.  In other words, it is essentially a dormant enterprise.

The SEC also argues Mr. Carmichael's relatively young age provides him with the opportunity to

commit future violations.  This may be true, but it also may explain at least some of his poor

judgment and recklessness with regard to the publicity campaign.  For these reasons, it seems

unlikely Mr. Carmichael will again violate securities laws.

---

[225] *Id.*

[226] *Id.* (internal quotations and citation omitted).

Finally, although Mr. Carmichael has not fully admitted to the wrongful nature of his conduct, he has expressed some regret about his involvement with parts of the transaction. Further, he has indicated, with the benefit of hindsight, that he will not become involved in that type of endeavor in the future.  The court believes this to be the case.  The court simply cannot conclude there exists a  "reasonable and substantial likelihood" Mr. Carmichael will again violate securities laws from his one-time violation with a scienter of recklessness.

The court also finds it unnecessary to impose an officer or director bar against Mr. Carmichael.  In order to impose such a bar, the court would need to find Mr. Carmichael unfit to serve in the capacity of an officer or director of a public company in light of the following factors: (1) the seriousness of the underlying securities violation, (2) whether the defendant is a repeat offender, (3) the defendant's role in the fraud, (4) the degree of scienter, (5) the defendant's financial stake in the violation, and (6) the likelihood of recurrence.[227]  Basically, for the same reasons the court finds an injunction against Mr. Carmichael to be unwarranted, there are insufficient grounds to impose an officer or director bar.

Finally, under the Sarbanes-Oxley Act, the Exchange Act, and the Securities Act, the court can impose a penny stock bar against any person "participating in, or, at the time of the alleged misconduct [which is the basis for the civil injunction action], who was participating in, an offering of penny stock."[228]  Even though the Sarbanes-Oxley Act was enacted after Mr. Carmichael's conduct, the court has always had authority to equitably impose a penny stock bar — the Sarbanes-Oxley Act simply codified this existing equitable remedy.

---

[227] *See SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995).

[228] 15 U.S.C. § 77t(g).

Gateway qualified as penny stock under the Exchange Act because it traded for less than $5 a share during all or most of the relevant time periods, it was not traded or quoted on the NASDAQ, and it qualified for no exemptions.  Further, Gateway's tangible assets totaled less than $2 million, and Gateway had been in continuous operation for less than three years.

The SEC basis its request that the court order a penny stock bar on its allegations that Mr. Mr. Carmichael attempted to induce the purchase or sale of the security by fraudulently increasing the market price of Gourmet Gifts/Gateway stock for his own personal profit.  But the SEC failed to prove Mr. Carmichael attempted to artificially affect the market in conjunction with Mr. Freed or that he owned large quantities of the stock.  Because the only claim the SEC successfully proved relates to a fraudulent publicity campaign, the court does not find it necessary to impose a penny stock bar.

In sum, the court finds Mr. Carmichael's actions and state of mind with regard to his securities offense do not warrant the imposition of an injunction, an officer or director bar, or a penny stock bar.

### (B)  Mr. Carmichael Should Disgorge His Profits and Pay a Civil Penalty

The SEC also asks the court to order disgorgement of Mr. Carmichael's profits.  The court agrees that, under the circumstances, this is appropriate.

When a defendant violates securities laws, the appropriate remedy is disgorgement of illegally obtained profits.[229]  Accordingly, Mr. Carmichael should be required to disgorge his illegally obtained gains and the benefits of his illegal conduct.  The court also finds it appropriate

---

[229] *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103–04 (2d Cir. 1972).

to order Mr. Carmichael to pay pre-judgment interest beginning July 1, 2002, to compensate for the use of his ill-gotten gains since that time.

However, the court orders additional briefing on this issue because the monetary figure the SEC cites as the appropriate amount for disgorgement is based on a finding of liability on all of the SEC's claims. But the court's actual findings of liability were much more limited. Furthermore, the parties dispute the amount of Mr. Carmichael's proceeds. In light of this, the court finds it necessary to order the parties to submit briefs on the amount of disgorgement and interest the court should order. The court would also like the parties to pinpoint the best evidence for the court to consider in making this determination. The parties should keep in mind that the court plans only to order disgorgement of all of Mr. Carmichael's proceeds related to his participation in the fraudulent publicity campaign. The SEC should file its brief addressing the issue by September 28, 2007. Mr. Carmichael must respond by October 12, 2007, and the SEC may reply by October 26, 2007.

The court is also considering imposing a civil penalty on Mr. Carmichael. Section 21(d)(3) of the Exchange Act gives the court jurisdiction to impose such a penalty. Under this section, the court may impose a first tier penalty for any violation of the Exchange Act.[230] The court may impose a second tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."[231] The court may impose a third tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . such violation directly or indirectly resulted in substantial

---

[230] 15 U.S.C. § 78u(d)(3)(B)(i).

[231] *Id.* § 78u(d)(3)(B)(ii).

losses or created a significant risk of substantial losses to other persons."[232]

The SEC argues third tier penalties are appropriate in this case because Mr. Carmichael's conduct involved fraud, resulting in a risk of loss to investors and substantial pecuniary gain to Mr. Carmichael. But the SEC provides no detailed briefing or factual analysis. The court, therefore, orders the parties to brief the issue of whether the court should order a civil penalty in light of the court's findings in this order. The parties are to consolidate their arguments into their briefs on the appropriate amount for disgorgement, following the briefing schedule outlined above.

## CONCLUSION

The court finds Mr. Carmichael liable for participating in a fraudulent publicity campaign in violation of § 10(b) of the Exchange Act. However, the SEC fails to offer sufficient evidence in support of its other claims. In light of the court's Findings of Fact and Conclusions of Law, the court ORDERS the SEC to brief the issues of (A) the amount of disgorgement and interest the court should order in light of its findings, and (B) whether a civil penalty is appropriate in light of the court's findings and the appropriate amount of any such penalty. This brief is due on or before September 28, 2007. Mr. Carmichael is to respond, addressing the same issues, on or before October 12, 2007. The SEC may file a reply by October 26, 2007.

DATED this 12th day of September, 2007.

---

[232] *Id.* § 78u(d)(3)(B)(iii).

BY THE COURT:

Paul G. Cassell
United States District Judge